# WHEELING.

MANN'S EX'RS *v.* ROBINSON *et als.*

Submitted January 19, 1881.   Decided December 3, 1881.

1. When the owner of land authorizes an agent to make a contract for the sale thereof, and it is done by the agent, he has no authority as an inci-dent to the authority conferred upon him to collect any portion of the purchase-money, which by the terms of the contract are to be paid at a future time.

2. *Quære:* Has such agent except under peculiar circumstances authority to receive so much of the purchase-money, as is to be paid in hand, as a necessary incident to his power to sell ?

3. An agent authorized to collect a debt can receive payment thereof in money only, and he has no right to accept any thing else in satisfaction without express authority from his principal, and if he does, it will be no pay-ment, unless ratified or assented to by the principal.

Appeal from and *supersedeas* to a decree of the circuit court of the county of Greenbrier, rendered on the 11th day of November, 1879, in a cause in said court then pending, wherein William T. Mann's executors were plaintiff's, and Robert Robinson and others were defendants, allowed upon the peti tion of said executors.

Hon. Homer A. Holt, judge of the eighth judicial circuit, pronounced the decree appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

On April 25, 1868, Mark L. Spotts, trustee, conveyed to John A. Hunter and Wm. T. Mann a tract of land in Green-

brier county of about one hundred and fifty or one hundred and sixty acres, sometimes called the Gasling tract, near Blue Sulphur Springs. On April 1st, 1862, John A. Hunter conveyed this land and several other tracts to his brother Henry F. Hunter, as it was afterwards decided by this Court in another suit, on a secret trust in favor of John A. Hunter; and in 1867 the land so conveyed to Henry F. Hunter was ordered to be reconveyed to John A. Hunter. In the meantime, on March 2d, 1863, Henry F. Hunter sold to Robert Robinson this one hundred and sixty acres of land owned by him and Wm. T. Mann and several other tracts. He did not disclose to Robinson at the time, that he held but a part of this one hundred and sixty acres of land for John A. Hunter, or that the legal title and ownership of the other part was in Wm. T. Mann. The whole of these lands were sold for $5,000.00, of which $1,000.00 was to be paid on April 1st, 1863, and the balance in four equal annual installments, for which he executed his bonds to Hunter.

The following is the article of agreement made and entered into by them:

"*Artickel* of *and* agreement *mzid* this the 2 day of March, 1863, between H. F. Hunter, of the first part, and Robert Robinson, of the second part:

" And that the said *parte* of the first part have sold to the party of the second part of the *jolering parsels* or *tracks* of *lands,* to-wit, the first *track,* known as the *Guesling track,* of one hundred and sixty *achors* of land, more or less, and adjoining the lands of the Blue Sulphur Springs, A. D. Johnson and others, 40 *achors* adjoining the *sane,* Renick and others, known as the *Skimmerhorn* entry, 45 *achors* on Snake run, *nown* as the Briant land and adjoining the lands of William *Hoalcomb* and others. These lands was conveyed by John A. Hunter to Henry F. Hunter and on record in the Clerk's *ofice* in Greenbrier county, for the sum of 5,000.00 *dolars,* in the following payments: One thousand dollars on the first day of *Aprile,* 1863, and one thousand a year until all the money is *payed,* and that the said H. F. Hunter binds himself and *airs* to make the said Robert Robinson a *warrentee dead* when the purchase money is all paid; and the said parties *heareby*

bind *theirselves, heairs,* executors and *adminestrators* for the performance of all and every part of the above agreement.

"As witness *hour* hand and seals—day and year first above written.

"HENRY F. HUNTER, [Seal.]
"ROBERT ROBINSON, [Sela.]

"JAMES W. BENNETT."

Two days after H. F. Hunter obtained from Wm. T. Mann the following paper:

"I, Wm. T. Mann, being part owner of the Amanda Gaslin tract of land, near Blue Sulphur, sold to Doct. Hunter and myself by said M. Gaslin, through trustee, now that the interest of said Doct. Hunter has been transferred by deed to Henry F. Hunter, do agree that said H. F. Hunter shall hold said land in his possession, with the understanding that the crops of hay or grain produced on said land shall be annually divided between said Hunter and Mann according to their respective interests; and that should said H. F. Hunter sell said land, then I, Wm. T. Mann, will endorse said sale and take my interest in money or bonds, as contracted by said H. Hunter; the parties to bear their equal share in the expense of keeping up farm till sold.

"Given under my hand this 4th March, 1863.

"WM. T. MANN.
"Teste—                                JAMES MANN.."

This paper was exhibited to Robert Robinson, before he had paid any portion of the purchase-money and very shortly after the sale to him. He had heard something about Mann's owning an interest in this land, probably the same day he bought, and he refused to pay anything on it, till after this paper signed by Mann was shown to him. He then from time to time made payments to Hunter, till all the purchase-money was paid. Robinson has been in possession of the land since this purchase.

On the first Monday in May, 1874, William T. Mann instituted this suit and the facts above stated were shown in the progress of the suit and stated in the bill and various amended bills and in the answers to them of Robert Robinson.

The object of the suit was to enforce a specific execution of this contract for the sale of this one hundred and sixty acres of land made by Henry F. Hunter to Robert Robinson, to ascertain the relative value of the several tracts of land named in this contract other than this one hundred and sixty acre contract, and to have so much of the amount so ascertained, which was to have been paid for, a moiety$_*$ of this one hundred and sixty acres of land, paid to the plaintiff, William T. Mann, and, if necessary, to have the land sold to pay the same. Henry F. Hunter died in 1867, and John A. Hunter in 1873. The personal representatives and heirs of both John A. Hunter and Henry F. Hunter as well as Robert Robinson were made defendants in the cause. Mann became *non compos mentis*; and on June 16, 1876, the suit was ordered to be prosecuted in the name of his committee. He afterwards died and the suit was revived in the name of his executors. A supplemental bill was filed Nov. 20, 1878, which was demurred to and the demurrer sustained. The character of it will be stated in the opinion.

Sundry depositions were taken, which prove the admissions of Henry F. Hunter and John A. Hunter, that Robert Robinson had paid them all the purchase-money of this one hundred and sixty acres of land, which the plaintiff excepted to as not legal evidence against him, and that Robinson had sold part of the land, forty-six acres, for $750.00, which was paid, but it does not appear to have been a part of this one hundred and sixty acres, in which Mann had an interest; and I presume it was a portion of the other lands sold to Robinson by Hunter. Mann died pending the suit, and after his death and the death of Henry F. Hunter Robinson's deposition was taken; and he proved, that his contract with Henry F. Hunter was made in Greenbrier county, and that Confederate currency was the currency then in circulation there, and his recollection was, the purchase-money was to be paid in the currency of the country. He had made allegations of this character in his answer, though nothing was said about Confederate currency. He proved that the purchase-money was paid H. F. Hunter in cattle, horses and sheep at agreed prices much under Confederate prices, and in notes given by others to Robinson before the war. He says, that in the first conversation about

the land he asked him about the pay for the land, and he said, he had nothing to do with it, that he turned it over to Hunter. These conversations and transactions with Hunter and Mann were excepted to as improper testimony, it being given after the death of these parties. The land is worth now, he says, from $2,500.00 to $3,500.00, it being in good condition. It was not worth $2,000.00 when he bought it.

C. Hoke proved, that "Mann told him, that Henry Hunter had come to his house during the war and told him this land was thrown open, exposed and doing no good, and he could sell it for good cash-paper, and he permitted him to do so. He said he was a sharp rascal, and his estate was insolvent and he never expected to get anything"; but it was proven, that at that time Mann's mind and memory were very weak. Shortly after the war, when his mind was good, he said to another witness, that "he understood that Robinson had paid Henry Hunter for this land, and he, Mann, must have his money or the land, that he had paid more than $1,000.00 for it."

Upon the hearing of the case November 11, 1879, the circuit court being of opinion, that Robert Robinson had paid for the several tracts of land mentioned in this written contract with H. F. Hunter dated March 2, 1863, decreed, that a commis- sioner of the court execute to him a deed conveying the title of all the parties to him, and that he recover of the executors of William T. Mann, to be levied of their testator's assets in their hands, the costs of this suit.

The executors of Mann have obtained an appeal and *supersedeas* to this decree.

*Dennis & Dennis* and *Price & Preston* for appellants relied upon the following authorities : 2 Story Eq. Juris. § 1127 and note 1; Sugd. on Vend. (2d Am. ed. 1820) p. 368, s. p. 82; 2 Tuck. Com. 451; 7 Ohio 70; 9 Leigh 387; Story Agency § 98, note 2; *Id.* note 5; 2 Story Eq. Juris. § 1131 a ; 13 East 432; Sugd. Vend. 32.

*John W. Harris* and *A. C. Snyder* for appellees relied upon the following authorities ; 4 Leigh 336; 13 W. Va. 728; 9 Leigh 387; Story on Ag. § 58; 6 Serg. & R. 146; 28

Gratt. 272 ; Story on Ag. § 98 ; Dunlap's Paley on. Ag. s. p. 275, 276; Story on Ag. §§ 90, 91, 255 ; 3 Kent. Com. 44 ; Story on Ag. § 124 ; Story on Part. § 94 ; 3 Johns. 375 ; 22 Pa. St. 479 ; Story Eq. Juris. §§ 387, 390, 391 ; 15 W. Va. 444.

GREEN, JUDGE, announced the opinion of the Court:

The only question involved in this case is : Had Henry F. Hunter under the circumstances, which the record shows existed, under the authority conferred by William T. Mann on him by the paper dated March 4, 1863, a right to receive in the manner, in which he did, payment of the five bonds executed to him by Robert Robinson on March 2, 1863, for the purchase of the tract of land of one hundred and sixty acres owned jointly by Mann and Hunter and of the other tracts of land named in the agreement between Hunter and Robinson of date March 2, 1863? There was, it is true, an effort made to prove, that Mann had verbally recognized some more extensive authority as having been conferred on Hunter ; but in my judgment this effort was a total failure. Of course the testimony of Robinson, the defendant, as to the conversation, which he had with Mann, whereby he recognized this larger authority, being testimony given after the death of Mann with reference to a conversation or transaction occurring personally between him and Mann is clearly inadmissible. See Code of West Virginia, ch. 1. 0, § 23, ¶ II, p. 619. The only other deposition on this point is that of C. Hoke, who simply testifies, that " Mann said, that Henry Hunter had come to his house during the war and told him, that his land near the Blue Sulphur was thrown open and exposed and not doing him any good ; that he could sell it for good cash-paper, and he permitted him to do so. He said he was a sharp rascal, and that his estate was insolvent, and he never expected to get any thing."

This certainly does not amount to a recognition of Hunter's authority to collect the cash-paper ; and it never was in point of fact sold by Hunter for cash-paper ; but it and other lands of Hunter, as the agreement shows, were sold not for cash paper but for $5,000.00, to be paid by the purchaser on time. But in fact I could give very little weight to this statement of

a loose conversation years after it occurred, especially as it is proven, that it was spoken by Mann many years after the transaction, when his mind and memory were very weak, if not almost gone. It really amounts to nothing and the extent of Hunter's authority must be determined by the paper Mann executed on March 4, 1863.

Some of the text-books lay it down broadly, "that an agent employed to sell has no authority as such to receive payment of the purchase-money." See Sugden on Vendors (14th ed.; 8 Am. ed. 1873) vol. 1, ch. 1, § 3, ¶ 11, p. 70, bottom p. 48. I apprehend, that this broad proposition needs qualification. If the property be personal property, the authority to sell for cash would carry with it generally the power and authority to receive the purchase-money. See *Hackney* v. *Jones*, 3 Humph. 612; *Taylor* v. *Nusbaum*, 2 Duer 302; *Higgins et al.* v. *Moon*; *Cross* v. *Haskins*, 13 Vt. 536, 540. But if the subject-matter of the authority to sell be land, it is important to determine accurately, what is meant by authority to sell. There cannot be a perfected sale of land but by conveyance; and a power of attorney under hand and seal authorizing an agent to sell and convey land for cash would confer on the agent the power to receive in cash the purchase-money, when the sale was made. See *Peck et al.* v. *Harriott et al.*, 6 Serg. & R. 146. On the other hand a verbal or parol authority to sell would mean simply an authority to contract to sell the land; for no verbal or parol authority could be given to make a perfected sale, that is, a conveyance. Such authority must be under seal. Ordinarily an authority to contract to sell would not carry with it an authority to collect the purchase-money. See *Mynn* v. *Jolliffe*, 1 Moo. & R. 327.

In *Ireland* v. *Thompson*, 56 Eng. Com. Law Rep. pp. 167 and 168, (4 Man. G. & S.) Maule, Judge, in speaking of this case says: "In the case of *Mynn* v. *Jolliffe*, 1 M. & R. 326, it was decided that an agent employed to sell an estate is not, as such, authorized to receive the purchase-money. And there is no doubt, that on the sale of an estate to imply such an authority would be most inconvenient and unnecessary; it being clearly for the interest of the vendor, that he, and not his agent, should receive the purchase-money; and no inconveni-

ence to any one arising out of the limit to the authority of the agent, which excludes his right to receive the money. The proper course is clearly, that the vendee should retain the money and the vendor the estate, till the conveyance is made ; and thus neither of them runs any risk of loosing the money."

These general views seem to me eminently sound ; and as I understand the case of *Peck* v. *Marriot*, 6 Serg. & R. 140, they are the views entertained by that court, though not so expressed in that case.

Sugden to sustain his general proposition refers also to *Pole* v. *Leach*, 28 Beav. 562, but I have not acceess to this case. Doubtless there are some cases, where a parol or verbal authority to sell land would under the circumstances be held to confer authority to receive the cash-payment on the sale of the land being made. Thus if an auctioneer be verbally authorized to sell a lot at public sale upon certain terms, one of which was, that ten per cent. of the purchase-money should be paid in cash on the day of sale, the auctioneer has authority to receive this cash-payment ; as the court says : "his authority to receive the stipulated deposit cannot be questioned. He receives the deposit not merely as the agent of the seller. He is bound to keep it for the indemnity of the purchaser, until the latter is enabled to look into the title proposed to be conveyed to him and decide on its sufficiency, or until the lapse of time limited for the purpose in fixing the day for the payment and security for the residue of the price."

So in the case of *Yerby* v. *Grigsby*, 9 Leigh 387, a decree was rendered, which impliedly affirmed, that an agent, who had been appointed by a verbal authority to sell land, had under the circumstances appearing in that case authority to receive the cash-payment. The court says not one word on this subject ; and this inference is to be drawn only from the decree. The reporter too fails to state, what the circumstances or evidence was ; in stating the law he merely says : "In the opinion of the court below as of this court the evidence established, that *John Green* was authorized by *Charles* to make such a contract as was made with the complainant." The contract which was made was a sale of two lots for $425.00, of which $250.00 was to be paid and, as the agreement states, was paid in cash to John Green. So far as I

can see, there was no authority from anything appearing in this case to justify the reporter in stating in the syllabus of this case, that so broad a proposition was held in it, as that "when the owner of lands authorized another to make a contract for the sale thereof, the authority of the agent to receive so much of the purchase-money, as is to be paid in hand, is a necessary incident to the power to sell." Nothing of the sort is said by the court; and no such broad proposition can possibly be inferred from the statement of the case or the decree entered.

But be this as it may, there is certainly nothing in this or in any other case, which I have seen, that gives any countenance to the idea, that a simple parol authority to sell land or, what is the same thing, to make a contract of sale would impliedly authorize the agent making the sale to receive the deferred payments of the purchase-money. Such implication would be entirely unnecessary in order for the agent to execute the authority conferred on him; and on every correct principle it could not be made. In such case it is clear, that no authority to the agent to collect any deferred instalments of the purchase-money can be inferred.

In this case not only was no authority given by Mann to Hunter to collect these deferred payments; but the paper, which Mann signed, seems to me to go much further than was necessary and clearly to negative the idea, that Hunter was to collect the deferred payments, if he sold the land. The language used is: "That should H. F. Hunter sell said land, I, William T. Mann, will endorse said sale and take my interest in money or bonds as contracted by said H. Hunter." It is perfectly obvious, that the bonds here referred to are the bonds for the purchase-money of the land when sold. Mann stipulates here expressly, that his share of these bonds was to be given to him, which is utterly inconsistent with the idea, that all these bonds were to be collected by Hunter. But even had there been express authority given by Mann to Hunter to collect the deferred payments of the purchase-money, when the land was sold, yet he would have had no authority to collect it in the manner, in which he did, that is, before it was due, receiving for it according to the deposition of the purchaser, Robinson, cattle, horses, sheep

and notes of third parties, which were payable to Robinson. An agent authorized to receive money or collect a debt can not receive another thing, as a house or a bond of a third person in discharge of a debt. See *Wilkinson & Co.* v. *Holloway*, 7 Leigh 284; *Gullett* v. *Lewis*, 3 Stew. (Ala.) 27 ; *Wiley* v. *Mahood*, 10 W. Va. 221. These were cases of attorneys at law, who being ahthorized to collect debts received payment in something else than money; but they show, that the principle is just as applicable to any other agent as to attorneys at law. Indeed they are based on the ground, that the authority of an attorney at law is the same as that of any other agent to collect a debt.

The collection too of a debt before it is due by an agent authorized to collect a debt is generally a violation of his duty; and the person, who knowing his authority pays him money in this way, is responsible, if the money is not paid to the principal. *Parnther* v. *Gaitskell*, 13 East 432.

In this case the payment by Robinson to Hunter, even had he been authorized to collect the deferred payments of the purchase-money coming to Mann, would because of their manner of payment have been a fraud on Mann, and this would have been the case more especially, as Robinson knew, that Hunter had concealed from Mann the fact, that he had sold the land. This Robinson knew; for he had read the paper signed by Mann, which on its face shows, that he was designedly kept in ignorance of this sale by Hunter. This ought to have put Robinson on his guard ; and even had Hunter been authorized to collect the purchase-money, he was under these circumstances certainly bound not to pay the purchase-money to Hunter, until it became due, and then in money only. The payment of it in horses, cattle and sheep in part before it was due was, it seems to me under these circumstances, a fraud on Mann ; for Robinson knew or ought to have known, that if he, Hunter, received this purchase-money in this way, he would appropriate all so received to his own use in fraud of his principal, Mann.

I do not think that the court erred in sustaining the demurrer to the supplemental amended bill, which was a repudiation of the contract made by Hunter with Robinson and sought a division of the land. It amounted to a new and entirely

different suit from the one, which was based on the original bill; and such a change in the character of the suit ought not to be allowed. See *Piercy* v. *Beckett*, 15 W. Va. 444.

The appellee's counsel claims, that these unauthorized acts of his agent, Hunter, ought to be held as confirmed by the long acquiescence in them by the plaintiff, Mann. The record discloses the fact, that Hunter with the knowledge and acquiescence of Robinson concealed for some time the real facts, even going so far as in the paper, which he got Mann to sign, to represent the land as unsold, when he had in possession Robinson's bonds for the purchase-money. Mann subsequently learned in some manner, how it does not appear, that Hunter had sold this land to Robinson; but, even when this suit was instituted, he did not know, that this sale was made, before he had authorized it. He had the legal title to the land. Robinson knew under what circumstances he executed to Hunter these bonds for the purchase-money, and that Hunter had no authority to collect them. He knew, that they had not been placed in his hands for collection by Mann, and that they were in Hunter's hands from the time they were executed. He was not misled or deceived. Mann was an old man, whose mind was very weak. Under such circumstances the lapse of time could not be regarded as a confirmation of the illegal acts of his agent Hunter. We have no reason to believe, that Mann ever knew with any accuracy, what Hunter had done. His original bill shows, that he did not; for in it he alleges, that all these bonds had not been paid by Robinson.

The assumption, that the paper signed by Mann on March 4, 1863, made him and Hunter partners in this land, and that thereafter they were not, as they had been, simply joint tenants, and that, as one co-partner can dispose of the assets of the firm without any express authority from his partner, therefore Hunter could dispose of the whole of this land without the assent or authority of Mann, strikes me as so novel and groundless as to require no consideration on our part.

Even had the circuit court been justified in holding, that Robinson had paid for this one hundred and sixty acres of land in full and was entitled to a deed therefor, it would have

erred in directing a conveyance of all the other tracts of land, which Henry F. Hunter by his agreement of March 2, 1863, had contracted to sell to Robinson, and in which tracts the plaintiff, Mann, had no sort of interest. A decree between co-defendants can be based only on pleadings and proofs between the complainants and defendants. See *Vance* v. *Evans,* 11 W. Va. 542. The portion of this decree, which directs those lands other than this one hundred and sixty acres to be conveyed by a commissioner to Robinson, is based on no pleading or proofs between Mann, the plaintiff, and the defendants, and it could not be properly made, no matter what might be the proofs; for the proofs bearing on the propriety of this part of the decree were introduced to sustain no issue between the parties to this suit.

For these reasons the decree of the circuit court of Greenbrier county of November 11, 1879, is reversed and annulled; and the appellants must recover of the appellee, Robert Robinson, their costs in this Court expended; and this Court proceeding to render such decree, as the circuit court ought to have rendered, is of opinion, that the plaintiffs are entitled to have a specific execution of the contract made by Henry F. Hunter with Robert Robinson on March 2, 1863, so far as the tract of land mentioned in it known as the Gasling tract of one hundred and sixty acres is concerned, and that in order that this may be done, it should be ascertained, what was the relative value of Wm. T. Mann's interest in said tract of land as compared with the other real estate named in said contract, and that the fair price of Wm. T. Mann's interest in said tract according to the terms of this contract should be ascertained, and if it should be shown, that the $5,000.00 named in said contract was the valuation put on said lands by the parties to said contract in reference to Confederate currency as the standard of value, then said price should be reduced to its true value. And when said price has been ascertained by the court, upon its payment to the plaintiffs in such reasonable time, as the court may fix, this defendant, Robert Robinson, will be entitled to a conveyance of the interest of the devisees or heirs of William T. Mann in said parcel of land. And if said price and the interest thereon so ascertained is not paid in such reasonable time, so much of

said land, as was owned by the said William T. Mann, should be sold, as will pay this price and interest thereon. And this cause is remanded to the said circuit court of Greenbrier county to be proceeded with acccording to this opinion and further according to the principles governing courts of equity.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED    CAUSE REMANDED.